UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) CASE NUMBER: 1:22-CR-10 |
| | ) |
| KENDRICK D. BATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**OPINION AND ORDER**

Defendants often say too much during a custodial interrogation. Kendrick Bates (Bates) managed to say both too much and too little in the same interrogation. Now, faced with five counts of distributing methamphetamine and one count of being a felon in possession of a firearm, (Indictment, ECF No. 20), Bates moves to suppress statements he made during that interrogation. (ECF No. 54). The Court conducted an evidentiary hearing on January 4, 2023 (ECF No. 60), and the parties have fully briefed the motion. (ECF Nos. 63, 69, and 72). Because the Court finds that Bates did not unambiguously invoke his right to counsel during questioning, the Motion to Suppress will be DENIED.

**DISCUSSION**

a. *Factual Background*

At daybreak on March 1, 2022, agents served a federal search warrant at Bates' residence on Spruce Creek Place in Fort Wayne, Indiana.[1] During the search, agents found guns, cash, drugs, and cell phones.

---

[1] Simultaneously with the execution of this warrant, agents executed a search warrant at a residence on East Maple Grove, which was believed to be a stash house. (Evid. Hr'g Tr. at 42-43).

Bates was home at the time of the search. After Bates voluntarily exited the home, agents placed Bates in handcuffs so officers could conduct the search. Fort Wayne Police Detective (FWPD) Alvin Davis (Det. Davis) took custody of Bates and placed him inside a FWPD Ford Explorer. (Evid. Hr'g Tr., ECF No. 64, at 23-24, 26-27). Det. Davis' in-car video/audio was activated and the Government introduced the footage in evidence. (Gov't Ex. 1). While in the SUV, Bates appears calm and cooperative and shows no signs of distress or any other infirmity. Det. Davis testified that it was cold on March 1 and Bates was dressed in a t-shirt and jeans, so he put the heat on inside the vehicle. Throughout the hour and forty minutes he is inside the vehicle, Bates engages Det. Davis in casual conversation, at one point asking Det. Davis why he became a police officer and at another point Bates joked with Det. Davis that he hoped agents would not take his "weed." When Bates had general questions about the search, Det. Davis responded to them. Throughout the in-car video the interactions between Det. Davis and Bates are polite and cordial and might be described as "pleasant" given the circumstances. At one point, Det. Davis checked on the status of the search for Bates and offered him bottled water. (Gov't Ex. 1).

After completing the search, FBI Special Agent Tyler Ludwig (SA Ludwig) and FWPD Detective Shane Heath (Det. Heath) approached the SUV where Bates was waiting. SA Ludwig, a 7-year veteran of the FBI and lead agent with the Fort Wayne Safe Streets Gang Task Force, greeted Bates and explained to him that while they had a federal search warrant for his house, they did not yet have an arrest warrant for Bates.[2] (Evid. Hr'g Tr. at 73). Bates was detained but not under arrest. (*Id.* "We explained to him he wasn't currently under arrest, he was being detained pursuant to the search warrant. We explained that he had not been criminally charged up to that

---

[2] There is no suggestion in the Defendant's briefs that Bates was treated improperly by Det. Davis or that he was intimidated or felt under duress when SA Ludwig and Det. Heath approached him in the SUV. At the hearing, the Government took great pains to have the agents explain how they were dressed when they approached Bates, whether a firearm was visible to Bates when they spoke to him, and whether there was any show of force by officers to Bates.

point."). Bates was advised of his *Miranda* rights. (*Id.* at 69). SA Ludwig then conducted a "field interview" explaining to Bates they were interested in getting Bates' cooperation and mentioned that agents had conducted "buys" from Bates and from others associated with him. (*Id.* at 73). SA Ludwig advised Bates that he was looking at a lengthy sentence for the drugs and guns and told Bates that an arrest determination would be made after Bates decided whether he was willing to cooperate. Bates asked questions about his safety if he cooperated since it would be obvious that his house was raided. (Evid. Hr'g Tr. at 76-77). SA Ludwig answered Bates' questions and Bates agreed to sit down and talk with the agents. At that point, Det. Davis transported Bates to the police operations center for a formal interview. (*Id.*).

Bates was placed in an interview room at 8:15 a.m. The recorded interview, in its entirety, was admitted in evidence. (Gov't Ex. 2). Bates was alone and waiting in the interview room for 15 minutes. During this time, Bates became impatient and demanded that agents talk with him. (Evid. Hr'g Tr. at 79-80; Gov't Ex. 2 at 15:00-15:15). SA Ludwig and Det. Heath eventually arrived and explained they were wrapping up the search of Bates' residence and had been delayed in arriving at the police operations center.

The interview formally began at 8:31 a.m. with SA Ludwig again advising Bates of his *Miranda* rights. Bates conveyed he understood his rights and signed a waiver. (Gov't Ex. 3). During the initial portion of the interview, SA Ludwig explained the investigation to Bates. He explained that they had Bates on 3 pounds of methamphetamine, multiple firearms and there were multiple search warrants underway. (Gov't Ex. 2 at 16:00-18:00). SA Ludwig also explained that based on the drug quantities Bates was facing a 10-year mandatory minimum on the drugs and a 5-year consecutive sentence for the firearms. Bates stated he was interested in cooperating because he was about to be a rap star and he could not do time in jail.

Having agreed to cooperate, it is a fair characterization to say that Bates was concerned about what he would get in return for his cooperation. SA Ludwig explained several times that he could not make Bates any specific promises. Bates told SA Ludwig that he had good information and stated he could give the agents the "whole world" and so much good information to make "all this shit go away." (Gov't Ex. 2 at 25:02-25:22). Bates told SA Ludwig that he "already knew how this worked" and he just wanted confirmation that he would be "alright" and not be "ass out." (Gov't Ex. 2 at 25:40-26:23). Because Bates was concerned about providing information about other people with no guarantees from the agents, Det. Heath asked Bates to tell the agents about his own operation. (*Id.* at 26:30). Bates then answered questions about the "stash house" on Maple Grove, his trip to Louisiana to meet a supplier, and his local supplier, Frank. (*Id.* at 26:38-34:30) At 31 minutes into the interview, Bates asked the agents what it would take to get himself out of this predicament. (*Id.*).

At 34:30 into the recording, SA Ludwig asked Bates about the quantity of drugs he was receiving from his suppliers. Bates then became concerned that he was "telling on himself." This concern led to the following exchange ("Exchange #1"):

> Bates: I think I need a lawyer because I don't, I don't know if I'm, what I'm telling you is helping me, you know, like what I'm saying, because you're asking me these questions about myself, and I'm incriminating myself right now. Instead of, you know what I mean.
>
> Ludwig: So I mean, do you want a lawyer?
>
> Bates: That's what I'm sitting here telling you bro. I'm willing to cooperate with you 100%, 110%, but I just don't trust you two guys.
>
> Ludwig: I appreciate that; I respect that [all talking at the same time].
>
> Bates: I don't trust you all, but I'm willing to work with you all, but I don't trust you all. I believe that you all will take my shit, and just whatever it is with it, you know what I mean. And it is just business. I ain't trippin'. If I can give you all what I need to give you all to walk away from this shit as clean as I can, then that's what

> I'm gonna do because I'm pretty sure that other motherfuckers is playing like they solid and shit but they ain't as solid as me. . . .

(Gov't Ex. 2 at 34:37-35:31).

After some unrelated discussions, the conversation returned to what Bates wanted to do (Exchange #2):

> Ludwig: I hear you man. . .I respect you man. I respect what you, you know, what you're saying. You just, you just gotta make that decision I guess.
>
> Bates: Bruh, I just made the decision. I just told you, I'll tell you what the fuck ever. I'll tell you anything.
>
> Heath: Yeah, but you sprinkled in the lawyer word, so what we gotta get past is whether or not you want a lawyer right now.
>
> Bates: OK, like I said. . .(Ludwig interrupting)
>
> Ludwig: I, just be up front with you, you continue to be up front with me, and I do, I 100% respect that. No matter what, how many times we talk about this, I just, I can't give you a guarantee...

(Gov. Ex. 2 at 36:35-37:12).

SA Ludwig testified that he understood that Bates was trying to decide whether he needed a lawyer. (Evid. Hr'g Tr. at 90). When Bates stated that he had made the decision, SA Ludwig stated he understood that to mean that he had already decided to cooperate. (*Id.* at 93-94). Additionally, SA Ludwig explained that in his experience, it is common for individuals to contemplate out loud whether they should invoke the right to counsel. (*Id.* at 91). Bates continued to provide information to the agents after the above exchanges. The interview ended at 9:46 a.m, about an hour and fifteen minutes after it had started.

### b. Analysis

In *Miranda v. Arizona*, the Supreme Court held that, before beginning custodial interrogation, law enforcement must advise a suspect of his right to consult with an attorney and

5

to have counsel present during the interrogation. 384 U.S. 436, 469-73 (1966). If during such an interrogation the suspect invokes his right to counsel, "the police must immediately cease questioning him until an attorney is present." *Davis v. United States*, 512 U.S. 452, 462 (1994) (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). But to trigger the right to have an attorney present during questioning the invocation of the right must be unequivocal. *United States v. Hunter*, 708 F.3d 938, 943 (7th Cir. 2013); *United States v. Hampton*, 885 F.3d 1016, 1019 (7th Cir. 2018).

In determining whether a suspect's request for counsel is sufficiently clear, the Seventh Circuit "has found statements indicating a certain and present desire to consult with counsel sufficient to invoke a defendant's right to counsel." *Hunter*, 708 F.3d at 943; *see also Hampton*, 885 F.3d at 1020 (finding that an invocation requires a statement that "requests an action (or permission to act)"). "[A]n ambiguous or equivocal reference to an attorney" is not enough to halt questioning until the suspect has the aid of counsel. *Davis*, 512 U.S. at 459. When assessing whether a suspect's statement is an unequivocal invocation of his right to counsel, the court "consider[s] the circumstances in which the statement was made as well as the words employed." *United States v. Wysinger*, 683 F.3d 784, 793-94 (7th Cir. 2012).

Bates' motion seeks to suppress all statements he made after he allegedly invoked his right to counsel. Bates argues that during Exchange #1, he unambiguously invoked his right to counsel when he answered SA Ludwig's question: "so I mean do you want a lawyer." Bates argues that his answer "that's what I'm telling you bro…I'm willing to cooperate but I just don't trust you two guys" is tantamount to a "yes" response. As for Exchange #2, Bates argues that he tried to invoke his right to counsel again but SA Ludwig prevented him from doing so when he interrupted him while he was responding to Det. Heath's question of whether he wanted a lawyer.

6

That Bates was subjected to a custodial interrogation is undisputed. Bates does not meaningfully suggest that his custodial interrogation was coerced or that he was mistreated in any way by the agents.³ Rather, Bates' main complaint is that the agents should have ceased questioning when he invoked his right to counsel. For its part, the Government argues that Bates did not make an unambiguous and unequivocal assertion of the right to counsel. It contends that the words employed by Bates and the circumstances prompting both exchanges suggest that he was not invoking his right to counsel but merely contemplating whether to do so. The Court sides with the Government.

In assessing whether a defendant has invoked the right to counsel, the Seventh Circuit focuses on action-oriented words. *See United States v. Alt*, 58 F.4th 910, (7th Cir. 2023) (Alt's statement "do you have a lawyer here?" devoid of any action-oriented words–such as "can" – that we have held sufficient to unequivocally invoke the right."); *Hampton,* 885 F.3d at 1020. When viewed in context, Bates' words lack the type of action-oriented words the Seventh Circuit finds necessary to invoke the right to counsel.

Exchange #1 began with Bates using equivocal words: "I *think* I need a lawyer." Bates clearly was contemplating whether he needed a lawyer. He was not requesting one. As Exchange #1 continues, SA Ludwig specifically asks Bates "do you want a lawyer?" Bates again equivocates "That's what I'm sitting here telling you bro. I'm willing to cooperate with you …but I just don't trust you…" From this response it cannot be inferred that Bates was invoking his right to counsel and, as a practical matter, if the Court has to infer it, the response is ambiguous — open to more than one interpretation. Indeed, a request for counsel must be sufficiently clear that a "reasonable

---

³ Bates makes an undeveloped argument that his statements were involuntary. (ECF No. 69 at 6). Bates offers no meaningful analysis of the facts to support his assertion that Bates' statements were anything but "the product of rational intellect," *Watson v. Detella*, 122 F.3d 450, 453 (7th Cir. 1997), and the Court sees no factual or legal basis for Bates' argument.

police officer … would understand the statement to be a request for an attorney." *Davis,* 512 U.S. at 459. SA Ludwig testified that he interpreted Bates statement to mean that he had decided to cooperate; not that he had decided to talk to a lawyer. The Court agrees that this is a reasonable interpretation of Bates' statement. *See Hampton*, 885 F.3d at 1020 (competing interpretations only reinforce the conclusion that a statement is ambiguous).

The Government points out that this case is much like the defendant's statements in *United States v. Hampton*. There the defendant had been arrested on multiple firearms offenses. While in custody he agreed to talk with officers but after being told that he was being recorded, Hampton said, "[a]ctually, I change my mind. I haven't even gotten a chance to get a lawyer or anything." 885 F.3d at 1019. Later in the questioning, Hampton said, "Maybe I should have a lawyer." (*Id.*). Hampton argued that these statements invoked his right to counsel. The Seventh Circuit disagreed finding that Hampton's statements "did not clearly show a present desire to consult with counsel." (*Id.*). The Seventh Circuit, citing its decision in *Lord v. Duckworth*, 29 F.3d 1216, 1221 (7th Cir. 1994) where it had hypothesized statements that would show clear invocations of counsel,[4] found that Hampton's statements were "neither specific nor action oriented." *Id.* at 1020.

So too, Bates' statements lack the action-oriented words required to show a present desire to consult counsel. In the same breath that he mentions a lawyer, Bates continued to make statements that he wants to cooperate and he wants a deal for the information he can provide. Even when he is directly asked if he wants a lawyer, Bates does not give an unequivocal answer. Instead, he continues to discuss cooperation and his concerns about trusting the agents. At most, Bates had the "potential desire to consult with legal counsel" which cannot invoke the right to counsel. *See United States v. Lee*, 413 F.3d 622, 626 (7th Cir. 2005) (explaining that "potential desire to

---

[4] Examples include: "Can I talk to a lawyer?" or "I have to get me a good lawyer, man. Can I make a phone call?"

8

consult with legal counsel" is not invocation of right to counsel). Bates did not unequivocally and unambiguously invoke his right to counsel during Exchange #1.

That brings the Court to Exchange #2. Bates argues that when SA Ludwig interrupted him while he was answering Det. Heath's question about whether he wanted a lawyer, he was prevented from invoking his right to counsel. This argument too, fails, for many of the same reasons set out above. First, the context of the exchange shows Bates continued to equivocate. In one breath he mentions a lawyer while in the very next breath he says he'll spill the beans (Gov't Ex. 2: "I just told you, I'll tell you what the fuck ever. I'll tell you anything."). Certainly, at this point he had not invoked, unambiguously, his right to counsel. A reasonable interpretation of his response is that he has decided to cooperate. It is also clear that the agents recognized Bates *might* be invoking his right to counsel. This prompted Det. Heath to ask whether Bates wanted a lawyer *right now*. Bates began to respond by saying "Ok like I said …" before SA Ludwig interrupted him. A fair inference from the start of Bates' response is that he would repeat his willingness to cooperate. But even without that inference, SA Ludwig did not prevent Bates from answering. Until now, Bates had asserted himself throughout the recorded interview and continued to do so. Nothing SA Ludwig did inhibited Bates from saying at any time during the questioning the magic words, "I want a lawyer." Bates did not and so his Motion to Suppress is DENIED.

## CONCLUSION

For the above reasons, the Defendant Motion to Suppress (ECF No. 54) is DENIED. The Court will set this matter for trial by separate entry.

SO ORDERED on June 1, 2023.

s/ Holly A. Brady
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT
