UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Cause No. 1:22-CR-10-HAB |
| | ) | |
| KENDRICK D. BATES | ) | |
| | ) | |

**OPINION AND ORDER**

On March 28, 2024, a jury found Defendant, Kendrick D. Bates ("Bates"), guilty of drug and gun offenses. (ECF No. 178). Ahead of his trial, Bates filed two suppression motions, both of which this Court denied. (ECF Nos. 78, 138). In his first motion, Bates moved to suppress statements that he made to law enforcement officers alleging that he invoked his right to an attorney. (ECF No. 54). In his second motion, Bates moved to suppress the evidence obtained during the searches of two residence in Fort Wayne, IN—one for a residence on East Maple Grove Avenue ("East Maple") and one for a residence on Spruce Creek Place ("Spruce Creek"). (ECF No. 94). Given the Court rulings on these motions, Bates' custodial statements and the fruits of the residential searches were admitted at Bates' trial.

Bates now moves this Court to vacate the jury's verdict and grant him a new trial under Federal Rule of Criminal Procedure 33(a). (ECF No. 183). He alleges that his motions were improperly denied and that justice requires a new trial. (*Id.*). Although new evidence surfaced at trial, nothing learned at trial warrants a new one. Bates Motion (ECF No. 183) will be DENIED.

## I.    FACTUAL BACKGROUND

### a.  Procedural History

Before trial, Bates first moved to suppress statements that he made during a custodial interrogation to law enforcement officers on March 1, 2022. (ECF No. 54). The Court held an evidentiary hearing on the motion (ECF No. 60) and the parties fully briefed the issues that Bates raised in his motion. (ECF Nos. 63, 69, 72). In its Opinion, the Court determined that Bates did not unambiguously invoke his right to an attorney. (ECF No. 78). The Court thus declined to suppress Bates's statements from the custodial interrogation. (*Id.*).

Next, Bates moved to suppress the search of the Spruce Creek and East Maple residences by mounting a *Franks* challenge, *see Franks v. Delaware,* 438 U.S. 154 (1978), to the warrant affidavit that supported the search. (*Id.*). After full briefing, the Court determined that the affidavit did not contain deliberate falsehoods or recklessly omit facts and denied the request for a *Franks* hearing. (ECF No. 138). The Court also found the magistrate judge's probable cause determination to be sound. (*Id.*). The case then proceeded to trial.

After a four-day trial, a jury returned a mixed verdict: it convicted Bates on two counts of distributing methamphetamine (Counts 3 and 5), being a felon in possession of a firearm (Count 6), and using or maintaining a drug premises (Count 7); but acquitted him on all other counts. (ECF No. 178). Bates now moves to vacate the jury's verdict and requests a new trial because he thinks the Court wrongfully decided his pretrial motions. (ECF Nos. 183, 187).

**b.  Search Warrant Affidavit**

The Court summarized the Search Warrant Affidavit in its Order denying Bates' Second Motion to Suppress and Request for a *Franks* Hearing. (ECF No. 138). For ease of reference, that summary is included below:

On February 28, 2023, Detective and Task Force Officer Adalberto Martinez[1] ("TFO Martinez") of the Indiana State Police ("ISP") obtained search warrants for the East Maple and Spruce Creek residences to search for evidence of drug trafficking activities. The warrants followed multiple investigations beginning in 2021 and lasting through the Defendant's arrest in March 2022. Supporting the request for the search warrants was TFO Martinez's affidavit, a twenty-three page summation of the investigation.[2] (ECF No. 94-1, at 5-27). Based on the information in the affidavit, TFO Martinez believed Bates was residing at the Spruce Creek residence and was using the East Maple residence as a stash house. (*Id.* at 7). And TFO Martinez informed the magistrate that the "affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter." (*Id.* at 6, 27).

TFO Martinez swore that in 2021, a Fort Wayne Police Department ("FWPD") confidential human source ("CHS#1) indicated that he could buy methamphetamine from Bates' co-defendant, Jacob Belcher ("Belcher"). (*Id.* at 7). CHS#1 told officers that Belcher was middling drugs for his supplier—later identified as Bates. (*Id.*). TFO Martinez considered CHS#1 to be credible and reliable based on corroboration through controlled buys. (*Id*. at 8).

CHS#1 performed three controlled buys of methamphetamine from Belcher, who obtained the drugs from Bates amid each buy. (*Id.*). All of the buys utilized the same standard procedures: pre-buy searches of CHS#1's person and vehicle, with no contraband ever found; the use of pre-recorded buy money, an audio and video recorder, and a live transmitter; surveillance to, from, and during the transactions; and post-buy searches of CHS#1's person and vehicle, with no contraband found other than the purchased drugs. (*Id.* at 8, 18-21).

The first controlled buy occurred on September 15, 2021, in which CHS#1 ordered a quarter pound of methamphetamine from Belcher. (*Id.* at 9). Belcher asked CHS#1 to pick him up and take him to his supplier. (*Id.*). Surveillance watched CHS#1 pick up Belcher and drive him to a local Walmart. (*Id.*) While in the car with CHS#1, Belcher called the supplier who was "right around the corner." (*Id.* at 9-10). Belcher counted the money that CHS#1 provided and informed the supplier of his location in the Walmart parking lot. (*Id.* at 10). Shortly after, a blue Buick with a particular Indiana license plate arrived in the parking lot near CHS#1's vehicle. (*Id.*).

---

[1] TFO Martinez has been an ISP trooper since 2003 and has been assigned to the FBI's Fort Wayne Safe Streets Gang Task Force for more than 11 years. (ECF No. 94-1 at 5). With the FBI, TFO Martinez has been investigating drug trafficking and violent crimes associated with drug organizations. (*Id.*). He has a wealth of experience with sophisticated investigative techniques including monitoring wiretap interceptions, writing wiretap affidavits, dismantling methamphetamine laboratories, performing undercover work, conducting surveillance, and managing controlled buys with informants. (*Id.* at 5-6).

[2] The affidavits supporting the search warrants for both the Spruce Creek and East Maple residences are identical. (ECF Nos. 94, 114).

Belcher exited CHS#1's vehicle and got into the Buick's back seat. (*Id.*) According to surveillance, the Buick's front seat passenger was a black male with long dreadlocks—later identified as Bates—and a woman was driving. (*Id.*). After being in the Buick for a few minutes, Belcher got back into CHS#1's vehicle and delivered the methamphetamine to CHS#1. (*Id.*). CHS#1 dropped Belcher off, met with investigators, and provided the purchased drugs. (*Id.*). The drugs field tested positive for methamphetamine and weighed about 110 grams. (*Id.*). Surveillance positively identified the Buick's passenger as Bates "when [he] exited the Buick at one point." (*Id.*). As Bates points out in his motion, there was no photographic evidence of Bates at any of these buys. (ECF No. 94 at 3). And the Report of Investigation ("ROI") never references the driver of the vehicle exiting the Buick at any point. (ECF No. 109-1).

CHS#1 coordinated another purchase of a quarter pound of methamphetamine through Belcher on September 23, 2021. (ECF No. 94-1 at 11). Again, CHS#1 picked up Belcher, but—unlike the previous transaction—Belcher had another customer follow them to the deal in a Ford Taurus. (*Id.*). Based on a recording, Belcher told CHS#1 that the other customers were buying a half-ounce of methamphetamine. (*Id.*) And Belcher said that he would separate CHS#1's order and their order after obtaining the drugs from his supplier, who he called "Ryder." (*Id.* at 11-12). Belcher then coordinated the deal. (*Id.* at 12).

Surveillance observed CHS#1's vehicle and the Ford Taurus arrive in the parking lot of a furniture store. (*Id.*). Belcher counted the buy money and called "Ryder" to execute the deal.[3] (*Id.*). Although surveillance could not get a good look at the deal, the search warrant affidavit states that "Ryder" is Bates' nickname. (*Id.* at 13). After returning to Belcher's residence, Belcher went inside to weigh the methamphetamine for CHS#1 and the other customers. (*Id.*). Belcher returned to CHS#1's vehicle and delivered the drug which field tested positive for about 100 grams of methamphetamine. (*Id.*). After CHS#1 left, surveillance continued to observe Belcher because he discussed meeting with the supplier to deliver the rest of the drug money. (*Id.*). Soon after, officers saw the same Buick in the driveway of Belcher's residence. The Buick was registered to Ride N Drive, LLC ("Ride N Drive") at 2711 Huntington Road. (*Id.* at 14).

On October 29, 2021, CHS#1 ordered a pound of methamphetamine from Belcher and the two arranged to meet. (*Id.*). Before CHS#1 met with Belcher, surveillance at Ride N Drive saw Bates arrive in the same Buick from the past two transactions. (*Id.*). The search warrant affidavit states that Bates briefly exited the vehicle and then returned to the Buick with an unknown man in a red hoodie. (*Id.*) Bates entered the driver's seat, and the unknown man entered the passenger seat (*Id.*). Yet the ROI for this investigation states the opposite: "2:46p.m. TFO Martinez observed Bates exit the driver's seat and an unknown male with a red hoodie get into the dark colored Buick in the parking lot of Ride N Drive." (ECF No. 109-2). According to

---

[3] Although the audio recording malfunctioned for some time, investigators determined that Belcher counted the buy money and told "Ryder" that he was coming to him for the deal. (ECF No. 94-1 at 12).

the search warrant affidavit, the unknown man then exited the vehicle and the Buick left to conduct the deal. (ECF No. 94-1 at 14-15).

After Bates and Belcher discussed a meeting location, CHS#1 and Belcher met the Buick on Monroe Street. (*Id.* at 15). After Belcher met with who officers believed to be Bates, Belcher complained on the recording[4] about Bates getting the order wrong. (*Id.*). Belcher and Bates then met at another location to provide the correct amount of methamphetamine. (*Id.* at 15-16). Surveillance observed the same Buick parked in the middle of the street next to CHS#1's vehicle. (*Id.* at 16). Belcher exited CHS#1's car and got into the Buick with Bates delivering the methamphetamine to Belcher. (*Id.*). The video and audio devices completely malfunctioned toward the end of this deal. (*Id.*). The purchased drugs field tested positive for approximately 469 grams of methamphetamine. (*Id.* at 17).

In December 2021, officers enlisted Belcher as a second confidential informant ("CHS#2")[5] who agreed to perform controlled buys from Bates. (*Id.*). CHS#2 stated that Bates had been his drug supplier for several months. (*Id.* at 18). And he confirmed that Bates had been the drug supplier for the first three controlled buys. (*Id.*). The search warrant affidavit explained that CHS#2 was cooperating to obtain a charging or sentencing benefit and—within the last five years—had a felony conviction for drug possession and misdemeanor convictions for conversion and false informing. (*Id.* at 17). Even still, based on the corroboration from the previous controlled buys, TFO Martinez believed that CHS#2 was credible and reliable.[6] (*Id.* at 18).

On December 15, 2021, CHS#2 performed a controlled buy of a quarter pound of methamphetamine directly from Bates utilizing the same procedures as the previous deals. (*Id.*). CHS#2 placed the order on recorded phone calls to Bates while in the presence of a detective. (*Id.*). Bates discussed that he needed to go to his other house to weigh the drugs, which TFO Martinez believed was a reference to Bates' stash house. (*Id.* at 19). As CHS#2 proceeded to a gas station, officers observed the same Buick parked at the East Maple residence. (*Id.*). After Bates changed the transaction location, surveillance saw a black male with long dreads exit the East Maple residence and leave in the Buick. (*Id.*). CHS#2 met the Buick and followed the Buick briefly before getting into the vehicle. (*Id.* at 20). CHS#2 later confirmed that Bates sold him drugs with the purchased item field testing positive for about 112 grams of methamphetamine. (*Id.*). After the deal, surveillance observed the Buick return to the East Maple residence and the same man entered the house. (*Id.*). In the search warrant affidavit, TFO Martinez stated that "the placement of the

---

[4] At several points during this transaction, the audio recording malfunctioned. (ECF No. 94-1 at 14-15).

[5] CHS#2 is specifically identified as Belcher in the unredacted affidavit which the Government filed under seal. (ECF No. 114).

[6] When the search warrant affidavit was drafted, TFO Martinez disclosed that CHS#2 was no longer cooperating and was not returning officers' phone calls. (ECF No. 94-1 at 18). CHS#2 believed that Bates knew of his cooperation and was not willing to deal with him anymore. (*Id.*).

audio/video recording device only captured audio for most of the controlled buy." (*Id.* at 19).

Defendant provided the audio and video recording for the December 15 controlled buy which he believes highlights discrepancies from the affidavit and the actual transaction. (ECF No. 136). Defendant questions the pre-buy search because, before meeting the supplier, CHS#2 went to obtain his identification card to buy a scale. (*Id.*). Although the search warrant affidavit does mention this, the recording confirms that CHS#2 went to a residence and interacted with at least one other person before returning to the store. (*Id.*). While inside the residence, CHS#2 is completely outside of officers' view. (*Id.*)  The affidavit simply states that "[CHS#2] went and obtained his identification and returned to [the store]." (ECF No. 94-1 at 19). And then officers "performed another pre-buy search." (*Id.*). Although an officer entered CHS#2's vehicle and spoke with CHS#2 after returning to the store and before the transaction, the video footage is almost completely obscured the entire time. (ECF No. 136).

On December 22, 2021, CHS#2 performed another controlled buy directly from Bates. (ECF No. 94-1 at 20). Before the deal, surveillance officers were watching the East Maple residence and observed Bates and another man in a blue Cadillac SRX registered to Bates. (*Id.*). Bates and the other man carried several totes inside the residence. (*Id.*). About an hour later, Bates directed CHS#2 to meet him at a particular location. (*Id.* at 21). Surveillance then observed Bates and his companion exit the East Maple residence and leave in Bates' Cadillac with Bates driving. (*Id.*). Surveillance followed the Cadillac to the deal and observed CHS#2 get in the back seat of Bates' vehicle. (*Id.*). CHS#2 later confirmed that Bates provided drugs in exchange for the buy money. (*Id.*) The purchased drugs field tested positive for around 112 grams of methamphetamine. (*Id.*). As to this buy, TFO Martinez stated that "[t]he buy recording audio was malfunctioning, with the camera obscured." (*Id.*).

Starting in early December 2021, surveillance established the Spruce Creek residence as Bates' home. (*Id.* at 17). A detective observed the Buick from the controlled buys at the Spruce Creek residence on December 3 and 8. (*Id.*). On December 8 and 9, officers observed other vehicles registered to Bates and his girlfriend at the residence. (*Id.*). And officers saw Bates arriving in his blue Cadillac from the last buy during the same time period. (*Id.*). On February 7, 2022, the same Buick was parked at the Spruce Creek residence. (*Id.* at 23). Bates' Cadillac and another vehicle registered to Bates' girlfriend were parked there the next day. (*Id.*). And a utilities check on February 7, 2022, revealed that "Kenderick Bates" was a tenant at the Spruce Creek residence with a move-in date in October 2021. (*Id.* at 24). Although Bates' first name was misspelled, the utilities account correctly listed the last four digits of his social security number. (*Id.*).

In January and February 2022, surveillance officers continued to spot Bates and his vehicles at the East Maple residence. (*Id.* at 22-23). On January 31, 2022, officers

observed a short visit by somebody which was consistent with a drug pickup from the residence. (*Id.* at 22). A day later, officers saw Bates and an unknown man leave the East Maple residence in Bates' Cadillac. (*Id.*). On February 7, 2022, Bates' Cadillac along with another vehicle were parked in the driveway with both vehicles soon leaving together. (*Id.* at 23). The same day, Bates' Cadillac was present with two other vehicles and, after about 30 minutes, all vehicles left together. (*Id.*). On February 18, 2022, officers watched Bates exit a blue Chevrolet Equinox, meet a woman in another vehicle, and enter the East Maple residence by unlocking the door. (*Id.* at 24). In TFO Martinez's experience, this in-and-out traffic was indicative of drug trafficking.[7] (*Id.* at 23).

Based on these facts, the magistrate found probable cause to search the East Maple and Spruce Creek residences for "[c]ontrolled substances, including methamphetamine; and firearms, ammunition, magazines, weighing scales and U.S. currency."

(ECF No. 138 at 1-8).

### c. Belcher's Trial Testimony

As mentioned in the Court's summary above, CHS#2 is Jacob Belcher ("Belcher") who testified for the Government at Bates' trial. Belcher's testimony at trial was different than the facts known to TFO Martinez when he swore to the contents of the warrant affidavit. Even so, the better part of his testimony was consistent with the contents of the warrant affidavit.

Belcher was visibly uncomfortable testifying at trial, but he discussed all five controlled buys mentioned in the warrant affidavit. For the first three buys, Belcher was the middleman for Bates. As for the last two buys, Belcher served as a confidential informant buying from Bates directly. For each buy, Belcher identified Bates as the supplier of methamphetamine before the jury.

---

[7] Based on TFO Martinez's training and experience, it is common for drug traffickers to use different locations as a stash house and living quarters. (ECF No. 94-1 at 24). In a stash location, drug traffickers commonly keep firearms, cash, ledgers, scales, packaging materials, phones, and other evidence. (*Id.* at 25-26). Because drugs and drug proceeds are stored in these locations, they are often burglarized or robbed. (*Id.*) Drug dealers often use a stash house to spread their risk of loss if one of their houses are compromised or raided by police. (*Id.*).

The information from the first three buys tracks the facts embodied in the warrant affidavit. Yet after the October 29th controlled buy, Belcher became a confidential informant for the FBI. At this point, Belcher shared new facts unknown to officers at the time TFO Martinez drafted and swore to the information in the warrant affidavit.

On December 15, 2021, Belcher called Bates and ordered four ounces of methamphetamine. (Trial Tr. Day 3, ECF No. 197, "Trial Tr. 3 at 43"). Bates asked Belcher to buy a scale. (*Id.*). When Belcher went to the store to get a scale, he realized that he did not have his identification, so he went to his house to retrieve it. (*Id.*). Belcher then called Bates who no longer needed a scale. (*Id.*). During this part of his testimony, Belcher was asked what he was worried about regarding the whole situation. (*Id.*). In response, Belcher stated, "Well, I just knew what I was doing could get me in trouble, could cause harm to myself or my family. You know, also had the potential to ruin my life and Mr. Bates' life as well." (*Id.* at 44).

Consistent with the averments in the warrant affidavit, the video footage from this controlled buy was completely obscured. During his testimony, Belcher stated that when officers gave him the recording device, he placed it in his sweatshirt pocket. When the prosecutor asked Belcher about the recording device, he testified:

Q: Was there some reason why you did that?

A: I didn't want them to see Mr. Bates on the video and I didn't want to be seen myself either.

Q: Okay. Why was that a concern for you?

A: Well, I wasn't trying to get either one of us in trouble. I was trying to figure out a way to get around it.

(*Id.* at 45). Even with these concerns, Belcher conducted the deal. (*Id.* at 46). Belcher got into Bates' car on a side street with Bates being the only other occupant. (*Id.*). Bates sold Belcher the methamphetamine and Belcher gave the drugs to officers. (*Id.* at 46-47).

On December 22, 2021, Belcher bought another four ounces of methamphetamine from Bates. (*Id.* at 47). Belcher again met Bates on a side street and got into the back seat of Bates' vehicle. (*Id.* at 47-48). This time, Bates was driving the car and there was an African American male in the passenger seat. (*Id.*). Although Belcher could not recall who handed him the methamphetamine, he confirmed that Bates coordinated the transaction. (*Id.*).

During cross-examination, Belcher further discussed the recording devices. For both buys where he acted as confidential informant, the audio recording was running the whole time. (*Id.* at 67). But he also intentionally obscured the video footage by placing the devices in his sweatshirt pockets. (*Id.*). Belcher's "intentions back then were not to try and get either one of us in trouble." (*Id.* at 68). Although Belcher did try to hide the device, at no point did he turn it off:

> Q: Okay? You had the device with you and you were trying to hide it, right?
> A: Right.
> Q: I mean, it would be fair to say that was intentional?
>  A: Yeah.
> Q: Okay. Because you said you were trying to, I think your words were, find a way out of it?
> A: Yeah.
> Q: And but you never turned it off, right?
> A: That's correct.

(*Id.*).

When officers interviewed and enlisted Belcher as an informant, he unintentionally saw a picture of Bates in an officer's folder. (*Id.* at 56). Based on that information, Belcher believed that Bates was the target of the investigation. (*Id.*). Belcher then confirmed that he would tell officers "whatever it is [they] wanted to hear" including "that [Bates] was the supplier." (*Id.*).

## II.    Analysis

9

### A.  Legal Standard

"Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A new trial is warranted when "the evidence preponderates so heavily against the defendant that it would be a manifest injustice to let the guilty verdict stand." *United States v. Conley*, 875 F.3d 391, 399 (7th Cir. 2017) (citation omitted).  "Granting a new trial in the interest of justice is reserved for only the most extreme cases, and we approach such motions with great caution and are wary of second-guessing the determinations of both judge and jury." *United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021) (citation and quotations omitted).

### B.  Discussion

As explained earlier, Bates believes that his motions to suppress and request for a *Franks* hearing were wrongfully decided such that justice requires a new trial. The basis for this belief comes almost exclusively from Belcher's trial testimony, summarized above. The Court will address each of Bates' arguments below.

#### a.  Motion to Suppress Statements

At trial, the Government admitted in evidence edited versions of Bates' interview with law enforcement. That interview, as outlined above, was also the subject of Bates' First Motion to Suppress. The Court denied that motion because it found that Bates did not unambiguously invoke his right to counsel. Bates does not provide any new evidence for this Court to consider that wasn't raised during his initial briefing of the issues. Nor does he advance any new argument. Instead, he recycles his First Motion to Suppress and merely asks this Court for a different conclusion.

The Court issued a nine-page Opinion and Order that documented why Bates' exchanges with law enforcement during the interrogation did not constitute an invocation of his right to

counsel. (ECF No. 78). That is the law of this case, and with no new information or argument, it so remains. *See Musacchio v. United States*, 577 U.S. 237, 245 (2016) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."). Justice is not served by reconsideration of the same evidence and the same arguments on the same issues. The Court's denial of Bates' First Motion to Suppress does not warrant a new trial, and the Court stands by its prior ruling. (ECF No. 78).

### b. Bates' Second Motion to Suppress and Request for a *Franks* Hearing

Bates does present new evidence related to his Second Motion to Suppress and Request for a *Franks* hearing. "'A defendant is entitled to a *Franks* hearing—an evidentiary hearing regarding the veracity of information included in a search warrant application—if he can make a substantial preliminary showing that: (1) the warrant affidavit contained false statements, (2) these false statements were made intentionally or with reckless disregard for the truth, and (3) the false statements were material to the finding of probable cause.'" *United States v. Hancock*, 844 F.3d 702, 708 (7th Cir. 2016). That showing is not limited to false statements but applies to material omissions as well. *Hancock*, 844 F.3d at 708. "Reckless disregard for the truth" means that "the officer entertained serious doubts as to the truth of the statements, had obvious reasons to doubt their accuracy, or failed to disclose facts that he or she knew would negate probable cause." *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012).

Bates argues that this Court's denial of a *Franks* hearing warrants a new trial because, at trial, Belcher admitted to intentionally obscuring the recording device during controlled buys by placing the device in his sweatshirt pocket. He claims that "[t]his important fact is conspicuously absent from Affiant's summary of the controlled buy and weighs heavily on Belcher's purported credibly [sic] as an informant." (ECF No. 187 at 8). But the focus under *Franks* is on what the

affiant, TFO Martinez, knew at the time he swore the affidavit not what evidence came to light at trial. *See United States v. Pritchard*, 745 F.2d 1112, 1119 (7th Cir. 1984) ("The [defendant's] proffered evidence must go toward showing either that the *affiant* lied, or that the *affiant* recklessly disregarded the truth because the affiant in fact entertained serious doubts as to the truth of his allegation[,] or had obvious reasons to doubt the veracity of the allegations.").

TFO Martinez drafted the warrant affidavit for the Spruce Creek and Maple Gove residences in February 2022. There is nothing to suggest that TFO Martinez knew that Belcher intentionally obscured the video footage on the last two controlled buys at the time he swore out the affidavit. *See Taylor*, 63 F.4th at 649. No doubt at trial Belcher admitted to intentionally obscuring the video footage, but again, Bates points to nothing to suggest that TFO Martinez knew of this at the time he drafted the warrant affidavit. Indeed, there is nothing in Belcher's trial testimony to suggest that he ever told law enforcement of this detail. Commonsense and Belcher's own testimony explains why it would have been illogical for Belcher to do so. (Trial Tr. 3 at 68) ("[L]ike I said, my intentions back then were not to try and get either one of us in trouble.").

Even more compelling is the fact that in the affidavit, TFO Martinez acknowledged that the recording device only captured audio on the first controlled buy and, on the second buy, the audio "malfunctioned" and the video was obscured. Those facts remain true.  There is simply no evidence that TFO Martinez tried to hide the ball from the magistrate and there is no evidence suggesting that TFO Martinez knew or ignored any facts other than what he wrote in the affidavit.

Bates also asserts that TFO Martinez' representation in the affidavit that he found Belcher to be a credible and reliable informant should not have been credited by the magistrate judge. But this argument is going nowhere. TFO Martinez provided a full picture of Belcher's baggage in the affidavit. He disclosed that Belcher cooperated to obtain a charging or sentencing benefit. The

warrant affidavit discusses Belcher's prior convictions for felony drug possession, misdemeanor conversion, and misdemeanor false informing. TFO Martinez also disclosed that, at one point in the investigation, Belcher stopped cooperating and was not returning calls because Belcher feared Bates knew of his cooperation. Despite all the above, TFO Martinez had a reasonable belief that Belcher provided credible and reliable information.[8] Further, he had a substantial basis for that belief due to Belcher's two controlled buys from Bates. *See United States v. Mullins*, 803 F.3d 858, 863-864 (7th Cir. 2015) ("[C]ontrolled buys add great weight to an informant's tip"). It is worth discussing that corroboration here.

During the December 15th controlled buy, surveillance had eyes on the Blue Buick that was used to conduct previous drug transactions. After Bates changed the transaction location for this buy, officers observed a black male with long dreadlocks that matched Bates's description exit the Maple Grove residence and leave in the Blue Buick. After Belcher met the Buick, he followed it briefly and then entered the vehicle. After the transaction, Belcher confirmed that Bates sold him methamphetamine. Surveillance continued to observe the Buick after the deal and witnessed the same man who matched Bates' description reenter the Maple Grove residence.

Before the December 22nd controlled buy, surveillance was watching the Maple Grove residence. Officers observed Bates and an unknown man arrive in a blue Cadillac SRX that was registered to Bates. The men carried several totes into the residence. After Belcher informed Bates that he was in the area, Bates and the man departed in Bates' Cadillac with Bates driving. Surveillance followed the Cadillac to the deal. When they arrived at the meeting location, Belcher got into the back seat of the Cadillac. Belcher later confirmed that Bates provided drugs in exchange for the buy money.

---

[8] TFO Martinez is an experienced officer. *See supra* note 1.

With this unrefuted information in the warrant affidavit, TFO Martinez's statement that Belcher was credible and reliable is completely reasonable. And Belcher testified at trial that Bates was the supplier for all of the controlled buys—not just the final two. Although Bates harps on the trial testimony from Belcher and urges the Court to conclude that TFO Martinez was somehow "reckless" in his assertion to the magistrate that he believed Belcher was credible, the Court finds nothing to support this contention. TFO Martinez told the truth insofar as he conceded that the video was, indeed, "obscured." And, in any event, the substantial corroboration and surveillance's observations support Belcher's credibility.

Finally, Bates again challenges the probable cause determination. But, as the Court has now said repeatedly, he offers nothing that would lead this Court to find that probable cause was lacking for the warrants *at the time the warrant applications were made*. This Court defers to the warrant-issuing judge's determination of probable cause if there is substantial evidence in the record to support the decision. *United States v. Koerth,* 312 F.3d 862, 865 (7th Cir. 2002). When an affidavit is the only evidence presented to a judge to support a search warrant, as it was here, the validity of the warrant hinges on the strength of the affidavit. *United States v. Orozco*, 576 F.3d 745, 748 (7th Cir. 2009). This Court found that the magistrate judge properly determined that probable cause existed to issue the search warrants.

Bates asks the Court to look at facts that the magistrate did not have before him to find that the probable cause finding was erroneous. This, the Court cannot do. He urges the Court to focus on Belcher's credibility, but as this Court has already said, TFO Martinez provided the information he had about Belcher's credibility to the magistrate.

Moreover, "[w]hen we evaluate a probable cause finding, we do not view the individual facts in isolation." *See United States v. Carswell*, 996 F.3d 785, 793 (7th Cir. 2021). Probable

cause to search a drug house may be based on any drug dealer operating from the house irrespective of whether the dealer is even identified. *United States v. Haynes*, 882 F.3d 662, 666 (7th Cir. 2018); *See also United States v. Gibson*, 996 F.3d 451, 461 (7th Cir. 2021) (finding controlled buys to establish substantial basis for issuing warrant for telephone location even though the dealer varied). The Buick and the Cadillac SRX were parked at the Spruce Creek residence, including in the garage, several times from December through February. Both vehicles were seen at the East Maple residence in January and February, as well as in conjunction with the controlled buys. The supplier—even if not Bates—used the Buick and the Cadillac SRX for the drug deliveries, and he used both the East Maple and the Spruce Creek residences to conduct his drug trafficking.

All told, TFO Martinez's affidavit (and the inferences the judicial officer may draw from the affidavit)[9] leaves no doubt that the magistrate properly determined probable cause existed to search the East Maple and Spruce Creek residences for evidence of drug trafficking activities. The Court is convinced that the information in the warrant affidavit, taken together, was sufficient to cause a reasonably prudent person to believe that a search of the East Maple and Spruce Creek residences would uncover evidence of drug trafficking activity. Bates' Motion for New Trial has no merit and is DENIED.

## CONCLUSION

For these reasons, Defendant's Motion for New Trial (ECF No. 183) is DENIED.

SO ORDERED on August 30, 2024.

s/ *Holly A. Brady*
CHIEF JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT

---

[9] *See Zamudio*, 909 F.3d at 175 ("[I]ssuing judges may draw reasonable inferences about where evidence is likely to be found based on the nature of the evidence and the offense.").